12-0-7-1-0-9-R-9-R Administrator of the Act State of Margaret Wilson, Appellee, Cross Appellate by Pamela Davis-Gropowski v. City of Joliet, Appellate, Cross Appellate by Gregory Smith Mr. Smith Good afternoon, court and counsel. Your Honor, we are here because on June 20, 2004, David Wilson shot and killed his wife, Margaret Wilson. Prior to that day, the day before, on June 20, there were three police contacts with the home. The first contact was at 11.14 a.m. On that contact, it was initiated by a 911 call by Margaret Wilson. She officially stated that my husband has threatened me and there are guns in the house, or I believe a gun is in the house. The police officer arrived as the initial officer, separated the parties pursuant to protocol, spoke to David, spoke to Margaret. He determined at that point there was no probable cause to make an arrest. In his conversations with Margaret, Margaret told him that there was a gun in the house and she believed she knew where the gun was. The officer told her to take him to where the gun was. During that time also, three other officers arrived. I think it should be noted that two of the officers were not even dispatched. They came to the house on their own. So there were a total of four officers in that house. Ultimately, three of the officers followed Margaret upstairs to a bedroom. She showed them where she thought a handgun was located. She searched around the bed. She searched the box. There was no handgun. She then affirmatively stated, there's no gun in the house. Officers, again, believing there's no probable cause to arrest, because there were no witnesses to the alleged threat, there's no gun found. They then tell Margaret, we'll stay around. We'll wait for you to leave while you pack your belongings. We'll take you anywhere. We'll take you to a shelter. We'll take you to a motel. They strongly suggested that she leave. Margaret told them, no, she wanted to stay and try to work it out with her husband. This was told to her upstairs, and it was again told to her downstairs. David denied making the threats, denied having the gun. David told the officers that they could not search his house. Shortly thereafter, at 1240, there was another police contact at the house. This was a call made, 9-1-1, was actually a call made by Margaret's daughter, Daughter Shreeman, in fact, that they had found David on the floor of the house, and he had passed out. Ambulance arrived. Police arrived. They examined him. They determined that he was okay. He just hadn't taken an insulin shot and gotten eaten. This then turned into Margaret trying to have David involuntarily committed. Paramedics examined him. They determined that he was not a danger to himself or others and that they could not involuntarily commit him. Between the first call and the second call, there were no additional threats made. There was no contact between Margaret and David. At 1.07 p.m., Margaret was outside of the house. She then flagged down another police officer who had not been in either of the prior two contacts. She stated that David was trying to get her to come into the house, and she believed he had a gun. That officer saw David sitting on the porch. He went and he pat-searched him, asked him if he had a gun. He found no gun. Again, there was no additional threats other than the additional threat reported by Margaret at the first call. That officer told Margaret, again, I'll wait around for you. If you want to leave, I'll take you anywhere. Margaret refused that. Again, that officer did not have cause to make an arrest. The statute in question is the Illinois Domestic Violence Act. That act requires police officers to do certain things in these situations, but what triggers it is whether or not the police have probable cause to make an arrest. The evidence, I believe, is clear that they did not in this case. The act also requires or states that the actions of the police have to be viewed in terms of whether or not their actions were willful and wanton. There were three cases cited. Moore v. Green, the Moore case, and all three of those cases, the courts found that the officer's head acted willfully and wantonly. In the Moore case, there's a 911 call, there's an order of protection. Police pull up, never get out of the car, and then pull off, and the victim is shot and killed. Didn't the act also, in another instance here, didn't the act also require the police to assist her in getting an O.P.? The act requires that, but the officer's testimony was she did not want to leave. So I would argue that in their view, then, she didn't want an order of protection. She specifically stated, I want to stay and work it out with her. In the Callaway case, there was a 911 call. Again, I believe in that case, officers arrived, did not get out of the house, and ultimately, they told her to call your private attorney. Excuse me, that was a Fenton case. In the Callaway case, another order of protection case, the 911 call, officers arrived. They actually see the people there, and they're arguing. There's an intoxication. They leave, come back, don't arrest anybody. They actually ask the victim whether or not she wants an arrest made, and they left the ultimate perpetrator at the house. Here, in our case, everybody testified that the parties were calm, which was totally unlike most domestic violence cases. Nobody was arguing. Nobody was yelling. Nobody was threatening anyone. So I believe there's no, the officers at the time, knowing what they knew at the time, they did not have probable cause to make an arrest. There were no witnesses to the threat. Anticipating my opponent's argument, I believe he will argue that there was another witness, the daughter. But the facts are clear that the daughter was not at the home at the time the initial 911 call was made. She testified to that. At best, at best, she came home while the police were at the house. All the police testified that they didn't see anyone else at the house. So at best, she was there after the fact. Additionally, after that last police contact, there were several things that occurred between these parties. That gets us to my second argument, which is a causation issue. The next-door neighbor tried to mediate the dispute. The dispute was over, David discovering that his wife, Margaret, was having an affair with another woman that she worked with. The neighbor across the street tried to mediate the dispute. He had them at his house. He also stated they were calm. There was a cookout at the home that was organized by the daughter, Sarah. At some point after this cookout, Sarah discovered that her mother was not at home. And she figured or determined that her mother was at the Kmart where she worked along with the woman that she was alleged to be having an affair with. So Sarah went to the Kmart, found her mother and the other woman in the parking lot, and confronted them. We're talking about now the night of June 20th. And she confronted them with a knife, a big argument, threats made. Sarah wanted her mother, because her mother at that point clearly decided to leave David and to be with the other woman. Sarah then called her brother, who lived 40, 45 minutes away. He came, and they both argued with their mother and told her that she should go back to David. David also appeared at that parking lot. He did not get out of the car. He did not say anything to his partner. He left. Margaret had apparently told him that she would go back to her husband. And she was driving. And as they were driving, there were four cars. Sarah slammed on the brake. There was a car chase that went through another jurisdiction. Another police officer got involved. The parties spoke to them, told them they didn't want charges pressed. So he let them go. They then went home. And again, there was arguments on the porch between Margaret and her kids about this affair that she was alleged to be having and that she should stay with David. David, at that point, was clear in the record from the letters that he wrote to the mother-in-law and to the daughter that he believed that they had worked it out, that they were going to stay together. And they were at home, and apparently he thought everything was fine. Then we moved to the next morning. That's when the murder occurred. David faced it. He was awakened by the dog barking. He went downstairs. And when he went downstairs, he heard Margaret on the phone talking to the other woman, telling her or professing her love for her. And that's when he shot her. I think that there is clearly a causation issue, a time issue. There are many events that occurred between the last police contact at 1 or so o'clock on the 20th, between the time of the murder on the 21st. An issue also is whether or not comparative negligence comes into play here. The trial court, and I argued it at trial, the trial court, in its opinion, noted that there was a difference of opinion. If you can apply it, one case said that you could apply it. Another case said that you couldn't. I believe it's clear that the trial court did not apply it. A clear reading of his order states that he didn't apply it. There's no percentage that's taken off for his verdict. I believe it's clear, based on the evidence here, that the police did not have probable cause, and there is a causation issue. Did the trial court really say that he didn't do it? It just kind of left it up in the air. He talks about the issue. Comparative negligence. I'm sorry? Comparative negligence. Yes. He talks about the issue. He says, yes, it can be in Illinois that it can be applied. And then he just kind of goes on. Yes. So we don't know. I mean, my reading of it, at least, is I don't know if you did it or if you didn't or whether you thought it was appropriate or not in this case. And it just then renders a judgment. So I don't know. Your reading of it is somewhat different, I think. My reading was I think he felt compelled to address the issue because I argued the issue. But I've never seen an order where a court would grant some kind of comparative negligence percentage and then not include it actually in the order. So it would usually be an award and then how much is taken off. And that was not done here. My reading is he addressed it because I raised it, but then he did not apply it. In any order where there's a comparative negligence, the trial court then would set out those percentages. Yes. And that was not done. That was not done. I know that both sides are arguing about comparative, but there was no indication that there was any finding of comparative negligence in that order. There was nothing in the order other than his discussion of a conflict as to whether or not it could even be applied. And then the order clearly doesn't apply. Thank you. Any other questions? Thank you, Mr. Smith. Mr. Berkowski. Thank you. May I please report, counsel? Illinois Domestic Violence Act was enacted to require police officers to actively intervene in situations of domestic violence. Purposes of the act include for officers and law enforcement personnel to recognize that domestic violence is criminal conduct and not just conduct that should be dealt with within the family. Another purpose was recognition that domestic violence frequently escalates and results in mutual family trauma, as we have here, as well as injuries and killings of officers responding to domestic violence situations. And thirdly, the act requires officers to take all reasonable measures to prevent additional incidents of domestic violence when there is reasonable belief that violence has occurred elsewhere. Counsel said that the act is only triggered when there's probable cause to arrest, and that's not consistent with the act at all. The act requires, when there's reasonable belief, officers should intervene. Arrest is one of the options that the officers would have, but it also has other steps that officers should take, including, as Justice Schmitz pointed out, offering to the victim that we could take him to the courthouse to get a word of protection. So the city's position is that, while we didn't have any substantiation that there was a threat by Davis to shoot Margaret, and so because there was no substantiation, there was no probable cause, and nothing could be done, and everything was done that could be done. And what the city is doing is arguing, basically, that, well, we don't have any information to substantiate the threat, so we didn't have to act. So, first of all, to say that, well, substantiation was required is not consistent with the purposes of the act. The act requires reasonable belief, and, again, arrest is just one of the options, and if in any instance for the act to come into effect, there has to be corroboration of what the victim has said has happened, that would be often difficult to enforce the act because, often, in domestic violence cases, there's a lot of confusion. So, in a domestic violence situation, one of those two people are there. Officer Davis said that substantiation isn't necessary, that officers can act based on the statement by the victim, and that the officers should have acted in that way. But assuming, as the city argues, that substantiation is so crucial for their involvement, then it puts more onus on them to do an adequate investigation of the victim. And so, the city has said here that there weren't any witnesses to the threat, and that's contrary to evidence, as we know it. So, on July 20, 2004, Margaret called 911 and said that her husband threatened to shoot her, that there were children in the house. The next, after she was shot, after Margaret was shot and killed on July 21, officers investigated what happened, and they talked to Sarah, Margaret's daughter, who's 21. And Sarah said, I was home, my father, my stepfather, threatened to kill my mother and her girlfriend, Michelle, and I saw him pull a necklace off her neck, and I was there. Let me ask you something. Sarah was involved in this incident at the parking lot and the chase, right? Yes. And didn't Sarah, especially, didn't Sarah then tell her mother to go back to her father? Yes, I think that's what Sarah wanted, for her mother to stay with her stepfather. So, is that consistent with somebody that thought that the father was going to kill the mother? I mean, she didn't call the police, she told her mother to go back home and be with her father. Well, Your Honor, I guess I would say that Judge Rawson found her testimony to be credible. And the 9-1-1 call, if you listen to the 9-1-1 call that Margaret made, the dispatcher asked her, are your children aware of what's happening today in the situation? And she said yes, so I think that's an indication that Sarah heard the threat. And Sarah told the police on July 21st that she heard the threat, and maybe she felt that things could be worked out, possibly with mental health issues or something, and she didn't want her mother to be in that relationship. I don't think there's any credible evidence that she did not hear the threat, and that she was present on that day when the police were there. And Sarah testified that she heard the threat, and Judge Rawson found her testimony to be believable. She testified that she was present when the police were there. She testified that she saw the police helping her mother with her gone upstairs, and Judge Rawson found that that indicated that she was there because she was able to say what the police were doing. She testified that she heard the threat, she heard her parents fighting, she took her three-year-old son to a neighbor, and then returned to the house when the police were there. So as counsel stated, she wasn't there when the 9-1-1 call was made, possibly, or she wasn't aware of it, but she testified that she was there when the police were there, and she saw them searching for the gun. But she walked by them, and they didn't ask her any questions. The four officers were there, and they didn't ask any questions. So there's certainly evidence to support Judge Rawson's conclusion that this was local and wanton misconduct by the police in failing to speak to her. He found that that was troubling, that they didn't seek out the daughter. And secondly, he said it was troubling that they didn't seek out the daughter, and Officer Davis said that that showed a consciousness, regardless of safety, of people in the house. It's like a failure to seek out the children in the house. And so I think the 9-1-1 call itself showed that children were there and were aware of what was happening. Well, just so you know, I'm just having a little trouble with the proximate cause. The people that knew her best, knew her husband best, the shooter, after the police leave, they go in and they tell her, go back home and be with your husband. And so they didn't think they were, I assume they weren't trying to get their mother killed. And so, but then she goes back and as they get further, she gets shot and somehow the police cause this. And just so you know, I'm having a little trouble with the proximate cause here. Well, your Honor, in the second call, which was 40 minutes later, Sarah, and this is uncontested here, Sarah was there, the police officer, she was there. Sarah told the police, my dad is suicidal. She told, she testified, she told the police about the threat. It's uncontested that she wanted her father to be taken to Provena for a mental health evaluation. The record shows, according to one of the reports, that one of the officers said he's fine and she said no, he's not fine. The 9-1-1 call said that he was acting crazy and I think it's uncontested that she asked that he be taken to Provena for mental health screening. And I guess I also say, you know, to say whether it was foreseeable that this was going to happen to be based on, you know, a young woman's impression solely is, might not be what's appropriate for the professionals who should be making the decisions about what actions are required. So if we, we have here a domestic violence situation with a victim. We have a threat of, a threat to shoot the wife and steps that should have been taken by the police in response to this, including an investigation and including speaking to David and asking him, did you threaten her or not? There's no evidence that they asked him that. The police were required to take all reasonable steps. And so they, according to Officer Davis, they had probable cause to arrest him. The officers on the scene admitted that if they had known of the threat, some of the officers on the scene didn't even know of the threat to shoot. Officer Baggett didn't know of the threat to shoot. He said, Sergeant Baggett said that if I had known there was a threat to shoot, I would have done an investigation. I would have talked to everybody. If I knew there was a threat to shoot, he could have been arrested. Officer Wilson said he would have been arrested. We know that if, going back to that first 911 call, that if they had followed the rules, he would have been arrested. And so how could he have shot her on the 21st? If he had been taken to the hospital on that day before he shot her and admitted, he would not have shot her that day. As far as going to the hospital, there were paramedics there, right? And there were certainly more medical professionals than the police. Officer Davis said paramedics really aren't qualified to make such a decision. Well, that's what they say. They're at least as qualified as police officers. And they've got more medical training, certainly. And I guess here's, again, going to practical questions, even assuming if the police mess up, that they don't do their investigation right, then after that, no matter what happens after that, then that creates the link and the person's involvement in a domestic dispute can go do whatever they want. In other words, go stick your head in the mouth of a lion, because whatever happens, the police are going to be responsible for it. Well, under the Act, the police are responsible if they don't take the steps required under the Act, which is to take all reasonable steps. And in a situation where he threatened to shoot her, he collapsed and was unresponsive, and as the officer said, now we have a mental health component in there, and the police also failed to let Margaret know that she could sign to have him taken. It's undisputed that Margaret and Sarah wanted him taken to Provena. I think it's undisputed that he was not in good mental health, and that he was a threat to someone else and a threat to himself, based on what they said. If it's undisputed, why did Sarah and her brother tell her to go back, and why did she go back? I guess the answer would be, perhaps Sarah doesn't have the best judgment, but the judgment here is of the police officers. And if the police don't have to decide, okay, he's going to be admitted, the police have to decide, is there a reasonable basis for us to evaluate this? And they should have known, they knew or should have known, that he threatened to shoot his wife. They knew or should have known, that day, he threatened to shoot Michelle. They knew or should have known that he was acting erratically, that he had mental health issues, he'd been suicidal in the past. Both people there, Sarah and Margaret, wanted him taken for an evaluation, and they did not even let Margaret know that he was required that he be taken. If Sarah wasn't afraid, Margaret wasn't afraid that day, and they definitely wanted him taken, and we know now that he had mental health issues, and so if he'd been taken, we would presume that they would find that out, and he would have been hospitalized 24 hours later. And if he'd been arrested, and if he was in jail, he would not have shot her. Under Fenton, there's evidence of willful wanton and a prostitute cause, that if he'd only been arrested, he wouldn't have shot the person. And also in this case, because the officers didn't give Margaret all the information that they should have, her rights for domestic violence, they didn't talk to her that she could afford protection, Officer Davis said they should talk to her about any situation where somebody's unemployed, somebody's taking an affair, or there's threats to shoot, people end up being killed. So part of the purpose of the Domestic Violence Act is to help victims who aren't helping themselves, and maybe to understand that the Act says our purpose is to give recognition that these can end up in inter-family homicides, and it should be the police who are aware of that, and communicating that to the victim, and possibly to the family. I mean, I would say that was part of their responsibility too, to say this is a situation that's dangerous, and maybe they could have talked to Sarah, and let her know that if they'd interviewed her, if they'd even talked to her. They didn't talk to her at all, they didn't know what information she had, and so going back to what they should have done then, they should have effected arrests. And this, the expert said they should have taken him to prison, and under fentanyl, that's a sufficient traction cause, that's what Judge Blasey found the proximate cause to be, and also, they should have assisted in giving information to the victim, and to communicate that this is a dangerous situation. And that is part of the purpose of the Act. And so, we know that 18 hours later, if he'd been arrested, if he had been taken to the hospital, it might not have happened. Even if he was rushed and released, it might have made him think differently. If he'd gone to the hospital, we have to believe that a qualified professional might see that he was really having trouble. He killed her the next day. And the premise is that these professionals can recognize that. The professionals at the hospital can recognize it better than the officers or the paramedics. Paramedics are really trained more medically than psychological and mental health issues. And again, they didn't let Margaret know that she could have had him taken. And that in itself, if Margaret knew it, she may have stopped her, but she could require it. If that in itself, if Margaret had signed the papers, that would be having him over there also. And so, the fact that the victim and the victim's daughter don't necessarily understand the danger doesn't mean that they don't have to be part of the Act. That's all the more reason why the Act is in effect, and why they're supposed to take those stuff. Thank you. Thank you, Mr. Kokoski. Mr. Smith, any rebuttals? I obviously agree that the Act was enacted to protect victims and to encourage police officers to take this type of situation more seriously. But it was also clearly enacted to help or protect police officers, because written right into the Act is the Wilfill and Watton standard. And that's why the standard is so high. Wilfill and Watton has been defined as utter indifference. So if you look at what the officers did that day, you have to ask yourself, did they act with utter indifference for the safety of Margaret? And I would say that the evidence clearly shows that that is not the case. They offered rides anywhere she wanted. They offered rides to a motel, social service agency. They gave her the number to the Joliet police officer. She was a social worker. Margaret's mother lived right around the corner also. With respect to Sarah and the statements, the evidence was clear that Sarah was not there when the 911 call was made. Sarah's testimony was she left the house at 830 a.m. that morning. Her testimony was that she was awakened by her parents arguing and there was something about a chain being pulled off of her mother's neck. But I think it's interesting to note that none of the officers said that Margaret ever said that. Margaret's only statement was, he's threatening me and he has a gun in the house, or I believe he has a gun in the house. The officer David that counsel keeps referring to was their expert. Their expert testified that she considered herself a domestic violence advocate and that any time someone makes a 911 call, in this case, you automatically have probable cause. And I would absolutely disagree with that. In her belief, there's no investigation needed. The police should have gone to the house and immediately arrested her. I think that's contrary to law clearly. And I believe her testimony should be disregarded as a result. The second call paramedics determined that David was not a danger to himself or others at the time. They determined that he hadn't eaten, he hadn't taken insulin shots. A wife, a spouse, cannot simply say, I want my spouse to be taken for mental health treatment. And that automatically be done without any evidence to suggest that that needs to be done. With respect to the order of protection issue, Margaret was clear. She stated, I want to try and stay and work it out with my husband. That was her statement. So there was no need for the officers to take her to get an order of protection. She didn't want to go anywhere. She wanted to stay home. And that's clear from the evidence. Thank you. Thank you, Mr. Smith. And thank you both for your argument today. We will take this matter under advisement with a written disposition within a short while. I'm sorry? Oh, okay. Sorry. Didn't mean to cut you off there. Judge Rossi discussed imperative negligence. So we have a prosecutor asking that the matter be remanded and asking Judge Rossi to make an award of 100% damages in this case. Judge Rossi, in his opinion, as you said, Justice Litton, discussed imperative negligence. He's discussed that you don't use imperative negligence if there's intentional conduct. And he said that, as alleged by the city in its affirmative defense, raising imperative negligence, Margaret did certain things, like not leaving the house. So he, it's in that paragraph it appears that he agreed with the city that there was, in their affirmative defense, that there was imperative negligence. And then he doesn't make a finding at all. He doesn't make a finding that she did act negligently, and he doesn't make a finding that she did not. Yeah, aren't both sides sort of speculating on the finding of imperative negligence? I mean, there's a brief discussion about the law on that in the order, correct? There's a discussion about imperative negligence. About imperative negligence. But when it comes down to, in this bench trial, to findings, there is no finding that I find damages of 100% of this figure, I find comparative negligence of this percentage. There's nothing like that. So there was no specific finding of comparative negligence. Correct. I think that we need to resume that judgment order that there's nothing in there that's and he did address it, but he didn't come to a conclusion. His conclusion was in the absence of a finding. That means he didn't make a finding of comparative negligence. Correct. But he did say that as alleged by the city, Margaret did do these things. And so that sounds like he's agreeing with the city. So our position is simply, if it's remanded to him with the direction, make an award of 100% of damages, and make a specific finding on comparative negligence, he could say, I found that there really was no comparative negligence, and I already did award 100% of damages of $455,000, or I skipped something and I did find it was comparative negligence. I think it's ambiguous enough that it would be warranted remanding it to him. I'm not asking you to make a conclusion that he did find comparative negligence, but just remand it to him to ask him to make a finding on comparative negligence, and to award consistent with that. We also have our process here where we say or we argue that comparative negligence is not appropriate in this case because the action arises under a safety statute enacted to protect a certain class of people, and the standard for an award is Wilford Martin. And so, like in the  So, we're asking that it be reversed, actually that the finding be that there is no comparative negligence, to have a default, and to make an award of 100%, whatever that number is determined to be by Judge Ross. I mean, is your argument that comparative negligence could just never apply under the Domestic Violence Act, or it doesn't apply in this case? Our argument is that it would not ever apply under the Domestic Violence Act because, first of all, the act was enacted because victims and Justice Reid, I think this also addresses your idea about, well, the victims don't seem to understand the danger, but the act was enacted because victims and families weren't able to protect themselves and weren't taking adequate measures. So, if the police came, they didn't do their job, they leave, a victim could walk over, provoke their other person, hand them a gun and say, go ahead and shoot me, and the police were on the hook for all of it. I think it's a question of whether there's a prior effect. I think that, obviously, if the victim said, please shoot me, that maybe there's a question of that. Okay, but it would be, so under some facts, I'm just going to make sure your position is that, because of the nature of this act, that there could never be comparative fault under the facts of this case. Okay, our position is, under the act, there would never be comparative fault, because it's a safety statute and the Supreme Court case has talked about this, that if a cause of action arises under a statute that was enacted for safety reasons, that was for the protection of a class of people, then we don't apply comparative benefits, and also the standard has to be both for one. So we know that this is a safety statute, this cause of action arises under the Domestic Violence Act, it wouldn't arise, there wouldn't be a cause of action because of the tortimony for the Domestic Violence Act. And so, under this class of statutes, according to our Supreme Court, as long as it's for a specific class of people, comparative negligence has to be applied in any situation. Okay, thank you very much. And again, thank you both. We will take this matter under advisement and get back to you as a written disposition within a short time. And we'll now take a short recess for a panel session.